**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MILTON JONES,<br><br>                    Plaintiff,<br><br>    v.<br><br>CITY OF BOSTON; and LOUIS<br>MCCONKEY, PETER O'MALLEY, and<br>JOHN J. DALEY, *in their individual*<br>*capacities*,<br><br>                    Defendants. | Civil Action No. 1:25-cv-13084<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

Milton Jones, by and through his attorneys, the law firm Neufeld Scheck Brustin

Hoffmann & Freudenberger, LLP, and attorneys John J. Barter, Esq., and Amy M. Belger, Esq.,

alleges as follows:

1.  Mr. Jones spent more than fifteen years incarcerated, and then almost thirty-two years

under restrictive parole conditions, for crimes he did not commit and in which he had absolutely

no role: the August 30, 1975, robbery of the Golden Café bar in Roxbury, Massachusetts, and the

murder of the bar's owner, Albert Dunn.

2.  Forty-six years after Mr. Jones was wrongfully convicted, and with the consent of the

Commonwealth of Massachusetts (acting through the Suffolk County District Attorney), Mr.

Jones's convictions were vacated. The Commonwealth, through the Office of the Suffolk County

District Attorney, then entered a *nolle prosequi* as to all the criminal charges.

3.  Then, in a separate civil proceeding, Mr. Jones sought compensation based on clear

and convincing evidence of his actual innocence. The Office of the Massachusetts Attorney

General, after a thorough examination of the record, settled that case for the maximum amount

permitted by statute.

4.   Mr. Jones's wrongful conviction was no accident—he was framed by detectives and officers from the Boston Police Department ("BPD"), who acted pursuant to the BPD's policies, patterns, practices, and customs in effect at the time. Indeed, the individual Defendants here were *serial* civil-rights violators and have caused *numerous* wrongful convictions.

5.   All in line with the BPD's policies, patterns, practices, and customs at the time, the individual Defendants framed Mr. Jones by fabricating false eyewitness identifications, engaging in improperly suggestive identification procedures, and burying exculpatory evidence.

6.   The individual Defendants engaged in such egregious misconduct because they knew they could get away with it, due to the BPD's longstanding policies, patterns, practices, and customs of looking the other way when officers engaged in misconduct; that is, the BPD systematically failed to train, supervise, and discipline its employees, allowing them to violate citizens' constitutional rights with impunity.

7.   Despite decades living under the restrictive terms of parole and being forced to navigate life unfairly branded as a murderer, Mr. Jones worked hard to achieve significant stability and to contribute to his community. In time, he got a job working with victims of violent crime and their families, and with offenders returning to the community. Mr. Jones continues this work today as the Director of Re-Entry Services at the Louis D. Brown Peace Institute.

8.   In 2020, when Mr. Jones sought to overturn his wrongful conviction, he had already been out of prison, on parole, for decades. Asking for a new trial carried substantial risk: a new trial could mean another wrongful conviction and a return to prison. Nevertheless, Mr. Jones knew he was innocent and cared deeply about clearing his name and getting out from underneath the restrictive parole conditions.

9.   His motion was successful, and the charges were dropped. Now, with his name finally cleared, Mr. Jones brings this civil-rights lawsuit to hold accountable the actors who caused his wrongful conviction: the City of Boston and Defendants O'Malley, McConkey, and Daley. The harm these actors caused Mr. Jones is nearly unimaginable. Although the harm includes physical injury, emotional pain and suffering, loss of a normal life, and more, what stands out most to Mr. Jones is that, because of Defendants' grave misconduct, he was wrongfully taken away from his daughter when she was only five years old. In Mr. Jones's own words, "When I was released my daughter was 20 years old—a young lady about to go into college. All those years were lost. I don't know what being a dad truly looks like. I don't know how I would have raised my daughter, since the opportunity to try was lost."

## JURISDICTION AND VENUE

10. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Jones's rights as secured by the United States Constitution.

11. This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. It also has supplemental jurisdiction over Mr. Jones's state-law claims pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

13. Mr. Jones respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

14. Mr. Jones has complied with the requirements of Massachusetts Tort Claims Act, Mass. Gen. Laws. ch. 258 § 1, *et seq*. Mr. Jones served the City of Boston, Corporation Counsel,

and the Boston Police Department, with presentment letters dated October 23, 2023. As of the date of this filing, Mr. Jones has not received any response.

**PARTIES**

15. Plaintiff Milton Jones is seventy-three years old and lives in Bridgewater, Massachusetts. Mr. Jones was wrongfully incarcerated from his arrest on September 23, 1975, until his release on lifetime parole on November 2, 1990. He spent approximately thirty-two years on parole, living with the stigma of a murder conviction.

16. Defendant City of Boston ("the City") is a municipality of the Commonwealth of Massachusetts, which oversees the BPD. At all relevant times, the City was responsible for the policies, patterns, practices, and customs of the BPD. The City is additionally responsible for the acts of each of the individual Defendants taken while they were employed by the City and while acting under color of state law and within the scope of their employment. At all relevant times, the individual Defendants were employed by or acting as agents of the City and the BPD while engaging in the conduct described in this Complaint.

17. At all relevant times, Defendant Louis McConkey was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws ch. 190B, § 3-803(d)(2).

18. At all relevant times, Defendant Peter O'Malley was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by

4

contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws ch. 190B, § 3-803(d)(2).

19. At all relevant times, Defendant John J. Daley was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws ch. 190B, § 3-803(d)(2).

## FACTUAL ALLEGATIONS

### Two men rob a bar in Roxbury—the Golden Café—and kill its owner.

20. Just before 10:00 p.m. on August 30, 1975, two men robbed the Golden Café bar in the Roxbury neighborhood of Boston. The shorter of the two men—described by an eyewitness as 5'6"—shot and killed the bar's owner.

21. The perpetrators took money from the cash register and from one of the bar's employees, forty-three-year-old Rita McLellan.

22. Rita's twenty-one-year-old daughter, Deborah McLellan, and another patron, fifty-eight-year-old Alma Condo, were the only other people in the bar at the time.

23. The eyewitnesses heard the shorter perpetrator call the taller perpetrator "Larry."

24. Minutes after the shooting, BPD officers began arriving on the scene. Officer Alfred Bozzi attempted to get a description of the perpetrators from each of the three witnesses. Rita reported that the shooter was 5'6", had a slim build, wore a flat hat, and carried a gun. She described the second perpetrator as six feet tall, twenty-five years old, and wearing a bright-colored shirt. She could not and did not describe either perpetrator's face.

25. Bozzi did not record a description given by either Deborah or Condo, and he later explained that, on the night of the crime, they were too emotionally distressed to give any description.

**Mr. Jones is innocent.**

26. Mr. Jones is completely innocent of the Golden Café robbery and murder.

27. Mr. Jones was not present at the Golden Café when the crime occurred.

28. Indeed, Mr. Jones has *never* been inside the Golden Café bar.

29. Mr. Jones had no knowledge of or involvement in the crime.

30. Instead, Mr. Jones was with a group of his friends. They were—along with hundreds of other people—waiting to see Kool & the Gang at a free summer concert put on by the City. Recorded music played while concertgoers waited for the band. When the live part of the concert was canceled (due to expected rain), Mr. Jones and his friends continued hanging out.

31. Consistent with Mr. Jones's innocence, no physical or forensic evidence ever tied him to the crime.

32. Mr. Jones is 6'2", nowhere close to the 5'6" shooter.

33. And Mr. Jones is not named Larry (the name the shooter used when speaking to the non-shooter). Nor has Mr. Jones ever been referred to as Larry.

34. Condo, one of the bar's patrons, was familiar with Mr. Jones—they previously lived in the same housing project, and she had seen him several times before. Yet she could not identify the perpetrators, even when Defendants McConkey and O'Malley repeatedly showed her Mr. Jones's photo.

35. The Commonwealth settled the claim Mr. Jones brought under Mass. Gen. Laws ch. 258D, a claim that requires clear and convincing evidence of innocence. In connection with that settlement, the Suffolk Superior Court entered an Order expunging the wrongful convictions

from Mr. Jones's record, specifically providing that the "charges and convictions expunged shall not . . . be used against Milton W. Jones in any way in any court proceedings or hearings before any court, board or commission in which Milton W. Jones is a party to the proceedings. M.G.L. c. 258D, § 7(D)."

### Mr. Jones is targeted by the BPD.

36. As discussed later, in "investigating" the Golden Café robbery and murder, Defendants repeatedly showed witnesses individual mug shots of 12 men and tried to obtain "identifications." Mr. Jones was one of the 12 men Defendants repeatedly offered up as possible perpetrators.

37. But there was no legitimate reason to include Mr. Jones: he had never been arrested for an armed robbery or a murder, so Defendants could not have reasonably thought that the facts of the crime suggested Mr. Jones might be involved. And Mr. Jones didn't match any description given by the witnesses.

38. Mr. Jones was included because the BPD didn't like him, because he had embarrassed the BPD.

39. The BPD had previously, on at least two occasions, accused Mr. Jones of crimes he did not commit. In those instances, the false allegations eventually embarrassed the BPD.

40. When Mr. Jones was a teenager, BPD officers arrested him for a crime he didn't commit. There was no evidence Mr. Jones committed the crime, but he was nevertheless detained in the police station. He was finally released, but only because a large group of civilians gathered outside the police station and publicly demanded he be released from his false arrest. The incident was highly public and highly embarrassing for the BPD.

41. Years later, BPD officers arrested Mr. Jones for an unarmed robbery he did not commit. He refused to take a plea, went to trial, and was acquitted by a jury.

**Defendants engage in suggestive identification procedures with eyewitness Rita.**

42. On September 17, 1975, two and a half weeks after the crime—and with not even a shred of evidence implicating the innocent Mr. Jones—Defendants McConkey and O'Malley visited Rita at her home, late in the evening, and brought along mug shots of 12 men, including Mr. Jones.

43. The shooter Rita had seen was someone she described as 5'6"—so definitively not Mr. Jones, who was significantly taller, at 6'2". And Mr. Jones is completely innocent—he has never been inside the Golden Café bar, including on the night of the crime—so Rita did not see him there.

44. Moreover, Rita did not get a good look at either perpetrator's face: her immediate report given to Officer Bozzi on the night of the crime described their heights, builds, and clothing—but not their faces.

45. Because Rita had noticed the perpetrators' heights, builds, and clothing, but not their faces, Defendants knew there was no legitimate reason to show her mug shots of potential perpetrators—because mug shots show the opposite of what Rita had observed: faces, but not heights or builds.

46. Through improper and unconstitutional pressure and suggestion, Defendants got Rita to select a photo of the innocent Mr. Jones and say that he was the shooter.

**Deborah identifies someone other than Mr. Jones, and Defendants bury that evidence.**

47. That same day, Defendants McConkey and O'Malley showed the same mug shots to Deborah and asked her if she could identify the perpetrators.

48. Deborah identified a photograph, but it was a photograph of someone else, not Mr. Jones.

49. Defendants falsely reported to the prosecutor that Deborah *did not* make an identification.

50. Priming her to subconsciously change her identification later, Defendants falsely told Deborah that she had identified the same person as her mother.

**Defendants use suggestion and coercion with Condo.**

51. The final eyewitness, Alma Condo, in fact provided evidence that Mr. Jones was *innocent*. Mr. Jones was not a stranger to her. Mr. Jones previously lived in the same housing project as Condo, and he visited friends there even after moving to another home. He was friendly with the man Condo's daughter was dating. Condo had seen Mr. Jones multiple times before the night of the crime. If Mr. Jones had been one of the perpetrators, Condo would have had no difficulty identifying him (or at least telling police that she recognized one of the perpetrators as someone she had seen before). But on the night of the shooting, she did not tell police that Mr. Jones was one of the perpetrators. She did not even say that she recognized one of the perpetrators as someone she had seen before.

52. Over the subsequent weeks, Defendants returned to her multiple times with Mr. Jones's mug shot in hand, and Condo repeatedly declined to identify Mr. Jones as one of the perpetrators. In the first half of September, Defendant O'Malley went to Condo's home at least four times and brought his mug shots with him (always including Mr. Jones's mug shot), but Condo never identified Mr. Jones as one of the perpetrators. O'Malley chose not to document any of these visits.

53. Defendants fabricated a photo identification from Condo: they falsely told the prosecutor that Condo picked out a photograph of Mr. Jones and said that he was one of the perpetrators of the Golden Café robbery and murder.

9

54. Condo *did* look at a photo of Mr. Jones and say that the photo looked like someone who had been following her. Mr. Jones had not been following Condo. Perhaps she was being followed by someone who looked like Mr. Jones. Or perhaps she simply saw Mr. Jones around the neighborhood where they both lived, or visiting his friends who lived in her building, and, with her nerves on edge due to the Golden Café crime, mistakenly thought he was following her. Either way, as Condo confirmed in sworn testimony, she *did not* tell Defendants, while viewing Mr. Jones's mug shot, that Mr. Jones or someone who looked like him was one of the perpetrators of the Golden Café robbery and murder—that's something Defendants made up.

55. In the middle of September, however, Defendants successfully coerced Condo into providing false evidence against Mr. Jones; that is, to appease Defendants, she became willing to say that Mr. Jones was one of the perpetrators, even though she knew that wasn't true.

56. On information and belief, Defendants coerced Condo in part by using leverage they had over her: Condo's daughter was involved in illegal drug activity, but Defendants were willing to look the other way.

**Defendants falsely arrest Mr. Jones.**

57. Based on the identification Defendants fabricated from Rita, Mr. Jones was arrested on September 23, 1975. No other evidence, including physical or forensic evidence, connected him to the crime.

58. Defendants McConkey and Daley interrogated Mr. Jones that same day and Mr. Jones truthfully maintained his innocence and said he knew nothing about the crime.

59. McConkey and Daley told Mr. Jones that a witness had identified him from photos. Mr. Jones, who is completely innocent, assumed the witness was a man, and responded: "Someone in that café picked out that picture of me? And said I did that? I don't understand that. He picked out my picture out of all these pictures? I don't understand that because I didn't do it.

I definitely did not shoot anybody." Because Mr. Jones knew nothing about the crime, he did not even know that there were three witnesses and they were all women.

60. Even though Mr. Jones did not ask for an attorney, and did not invoke his constitutional right to remain silent, the interview lasted only a few minutes—because McConkey and Daley knew Mr. Jones was innocent and had no reliable information to provide about the crime.

61. Mr. Jones was told (by McConkey and Daley) that the BPD would detain Mr. Jones even though they knew he was innocent, unless he provided evidence against someone else. McConkey and Daley said they could get more witnesses to say that Mr. Jones was one of the perpetrators, and would do so unless Mr. Jones provided the name of someone else to pursue.

62. Mr. Jones did not know who committed the crime. He did not give Defendants any names.

### Defendants' fabricated evidence is presented at a probable-cause hearing, and Defendants use that hearing to fabricate additional identifications.

63. Rita testified at the probable-cause hearing. Before she testified, Defendants reinforced their earlier suggestion by again showing her Mr. Jones's mug shot, and by telling her that her task was simply to "identify" the perpetrator they had already picked up. And Mr. Jones was her only option: he was the only person sitting in the "dock," the area reserved for criminal defendants. Rita "identified" him.

64. Because Defendants had buried Deborah's actual identification, and falsely told the prosecutor that Deborah did not identify anyone, the prosecutor had not intended to call Deborah as a witness.

65. But because Defendants had falsely told Deborah that she had identified the same person as her mother, Defendants were able to fabricate an identification from Deborah too.

Defendants had Deborah watch as her mother identified Mr. Jones as the shooter. Right after that, Deborah unsurprisingly said she too could identify the shooter, and said it was Mr. Jones.

66. And Defendants used the probable-cause hearing to complete their fabrication of an identification from Condo. Before the hearing, Defendants told Condo that they had caught the shooter and he would be in court, and all she had to do was "identify" him. Because Defendants had pressured and coerced Condo, and promised leniency for her daughter, Condo went along. Condo "identified" the only person sitting in the area reserved for criminal defendants—Mr. Jones—as the shooter.

**Defendants suppress exculpatory evidence.**

67. Set on pursuing Mr. Jones despite the utter lack of evidence of his involvement, Defendants buried the exculpatory and impeaching evidence that would have undermined their manufactured case.

68. Defendants kept secret the improper suggestive techniques they had used to get Rita to falsely identify Mr. Jones as the shooter.

69. Defendants kept secret that Deborah had identified someone else, not Mr. Jones, as one of the perpetrators.

70. Defendants suppressed the fact that they (falsely) told Deborah that she had identified the same person as her mother.

71. Defendants kept secret the pressure, coercion, and promises of leniency they used with Condo to get her to provide false evidence against Mr. Jones.

72. Defendants lied, falsely representing to the prosecutor that these witnesses made positive identifications of Mr. Jones without any improper pressure or suggestion.

73. And Defendants kept secret that the witnesses heard the shooter refer to the other perpetrator as "Larry."

12

**Mr. Jones is wrongly convicted based on fabricated and unreliable eyewitness accounts.**

74. Before trial, the Commonwealth offered to let Mr. Jones plead guilty to a lesser charge. He declined, refusing to accept responsibility for a horrible crime he did not commit.

75. The case against Mr. Jones was exceptionally weak. No physical or forensic evidence linked him to the crime, and he had consistently maintained his innocence.

76. The only "evidence" against Mr. Jones was the fabricated evidence discussed above: the deeply flawed identifications from Rita, Deborah, and Condo.

77. As the Commonwealth of Massachusetts has since admitted: "An examination of the record reveals that the identification procedures in this case resulted in flawed and questionable identifications—identifications which comprised the *only* evidence linking [Mr. Jones] to the shooting."

78. Neither the prosecutor nor the jury learned that Defendants had fabricated these identifications. They did not hear that Defendants: used improper pressure and suggestion with Rita; buried Deborah's actual identification; falsely told Deborah she had identified the same person as her mother; and pressured and coerced Condo and promised leniency for her daughter.

79. Because the prosecutor did not know the identifications had been fabricated, and did not know Deborah's actual identification had been buried, he made this pitch to the jury: "[W]hat does it say to you that three people identified a man as being a murderer? It's possible that one person can be mistaken. Indeed, even two, or possibly three. But the odds rapidly go up in favor of truth when you start getting more than one person identifying a particular defendant."

80. Although the State's theory was that Mr. Jones was the shooter, the jury heard that the *initial* eyewitness description of the shooter was a man only 5'6" tall, while the description of the non-shooter was a man about 6' tall (much closer to Mr. Jones, who is 6'2"). The jurors were

instructed that they should convict if they believed Mr. Jones was *either* of the two men (because the two men were engaged in a common enterprise).

81. But the jury did not learn that the witnesses heard the shooter refer to the other perpetrator as "Larry."

82. Based on the fabricated evidence, and without the benefit of the exculpatory and impeaching evidence, on September 23, 1976, the jury convicted Mr. Jones of the Golden Café crimes (second-degree murder, two counts of armed robbery, and one count of unlawfully carrying a firearm). Mr. Jones was sentenced to incarceration for a term of "natural life" on the murder, fifteen to twenty years on the robbery, and two and a half to five years on the firearm count.

**Mr. Jones is released on parole. Decades later, a post-conviction investigation ends in the vacatur of his convictions and *nolle prosequi* of the criminal charges.**

83. In November 1990, Mr. Jones appeared for a parole hearing. Although he knew it hurt his chances at parole, he truthfully and steadfastly maintained that he had absolutely nothing to do with the Golden Café crime.

84. The parole board unanimously granted his application. By the time he was released on parole, he had spent fifteen years wrongfully incarcerated.

85. For the next thirty-two years, Mr. Jones was forced to navigate life wrongfully branded as a murderer. He lived under restrictive parole conditions. He was visited at home at all hours of the night, and was called out of work with no advance notice, so he could pee in a cup while being watched. The psychological and emotional impact of living under parole still torments Mr. Jones to this day.

86. Finally, with the help of the Boston College Innocence Program, on August 3, 2020, Mr. Jones sought to overturn his wrongful conviction, arguing he was entitled to a new trial

based on innocence, new developments in the science and law concerning the reliability of eyewitness identifications, newly discovered exculpatory evidence that had been unconstitutionally withheld from him, and other law-enforcement misconduct.

87. Asking for a new trial carried significant risk: a new trial could result in another conviction, and the sentencing judge might send Mr. Jones back to prison. But Mr. Jones was completely innocent and deserved to have his name cleared.

88. After reviewing the trial record and conducting a reinvestigation, the Commonwealth assented to the motion, conceding that "justice was not done" in Mr. Jones's case.

89. On November 10, 2022, Superior Court Justice Michael D. Ricciuti granted the motion for a new trial and vacated Mr. Jones's convictions.

90. On December 12, 2022, the Commonwealth filed a *nolle prosequi*, which caused all charges to be dismissed.

**Mr. Jones's wrongful conviction was caused by the City's
unconstitutional practices and deliberate indifference.**

91. The unconstitutional conduct of the individual Defendants described above was directly and proximately caused by long-established policies, patterns, practices, and customs in the BPD.

92. At the time relevant to this case, there was a pattern, practice, custom, and policy whereby BPD officers created false identifications. Individual "witnesses" who had little or no information about a crime were subjected to repeated police intervention, and the witnesses were incentivized and intimidated into making identifications of individuals whom the police chose as their suspects. Time and again, innocent men were convicted of serious offenses, including rape and murder, and imprisoned for decades based on unreliable and fabricated identification evidence.

93. At the time relevant to this case, there was a pattern, practice, custom, and policy whereby BPD officers fabricated evidence against their suspects, and suppressed material evidence that was favorable to their suspects (favorable because it was either exculpatory or impeaching). The City knew that officers often fabricated evidence (including witness identifications), coerced testimony, and suppressed evidence, but the City took no steps to prevent officers from doing so.

94. At the time relevant to this case, there was a pattern, practice, custom, and policy whereby the City systematically failed to train, supervise, and discipline its officers, leading to a culture of impunity that encouraged and permitted the type of officer misconduct described above.

95. At the time relevant to this case, the City had notice of a widespread practice by the BPD's officers and agents pursuant to which individuals suspected of criminal activity were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

96. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue in this case, by failing to adequately train, supervise, and discipline the BPD's officers, agents, and employees who withheld material evidence, fabricated false evidence, and pursued wrongful prosecutions and convictions.

97. These widespread practices were allowed to exist because municipal policymakers exhibited deliberate indifference to the misconduct, thereby effectively ratifying it.

98. Indeed, *the BPD Commissioner* from 1972 to 1976—the exact time when Defendants framed Mr. Jones—has admitted that the BPD had no policy requiring the disclosure of exculpatory or impeachment evidence, and that it was the *standard practice* to withhold exculpatory and impeachment evidence. He explained that BPD officers could and did deliberately suppress exculpatory and impeachment evidence and faced zero repercussions for doing so. He further explained that the way the BPD operated was that "if officers felt that they had their man, they were not going to do anything to help the defendant or his attorney."

99. And the *BPD's Director of Training and Education* from 1973 to 1976, who also served as the Assistant to the Commissioner for Operations from 1976 to 1978—again, the exact relevant time frame—explained that there was a policy and practice of withholding exculpatory and impeachment evidence that newer officers learned on-the-job from more senior officers. The Director of Training and Education explained that he met frequently with the Commissioner, and the Commissioner was aware that officers were withholding exculpatory and impeachment evidence specifically so that they could secure arrests and convictions. The Director explained that "[t]here was a sense within the Department that officers were not in the business of helping out persons they perceived to be criminals."

100. The same BPD Commissioner and the same BPD Director of Training and Education mentioned above have both explained that the BPD in 1973 to 1976 suffered from an obvious lack of training, including training on the clearly established constitutional right to disclosure of exculpatory and impeachment evidence. Their views have been corroborated by under-oath testimony from numerous BPD officials who worked during the relevant time frame.

101. And that obvious failure to train continued for years. In 1992, a Management Review Committee chaired by James D. St. Clair issued a scathing report concerning the state of

the BPD's grossly inadequate training, supervision, and discipline.[1] That report carefully documented how "[m]anagerial training was 'dangerously inadequate' and detective training was virtually nonexistent." The report also documented how the BPD, including through its internal-affairs department, was creating an "unnecessarily dangerous situation for the citizens of the City of Boston" by inadequately supervising and disciplining officers who had demonstrated "established patterns of alleged misconduct."

102.    BPD officers' withholding of exculpatory evidence was also testified to by an Assistant District Attorney who worked in Suffolk County between 1972 and 1978. This prosecutor explained that BPD officers did not want to put "anything in a report that could hurt [their] case" and so there was a "natural reluctance from the Boston Police to put everything into a report, particularly exculpatory." Speaking about instances in which he learned that exculpatory evidence had been withheld from him by BPD officers, he testified, "[i]t happened all the time."

103.    It was not until 1992 that the BPD adopted "Rule 320," which directs that "[a] police officer shall immediately notify the prosecutor of a case in which he is involved of all material facts which could affect the prosecution of the case as soon as such facts become known to him."

104.    It was not until 1995 that the BPD adopted "Rule 113" which includes the Canon of Ethics, including the Canon that officers "shall not falsify evidence."

105.    A thorough report by the Boston University Center for Criminal Justice, entitled *Police Policymaking to Structure Discretion: The Boston Experience*, analyzed data collected

---

[1] *See* Report of BPD Management Review Committee, Jan. 14, 1992, available at https://archive.org/details/reportofbostonpo00bost.

between April 1975 and August 1978 and found that BPD officers were allowed to continue operating, and were even promoted, even though their supervisors and high-ranking officials knew they were not following binding constitutional and civil-rights laws.

106.    A 1968 article in the Boston Globe entitled *'Misconduct' Report Angers Boston Police* described a report that looked at officers from the BPD as well as from police departments in Washington, D.C., and Chicago. The report showed a whopping 27% of officers had been observed while, or had admitted to, engaging in police misconduct. The Globe article further reported that the BPD Commissioner's reaction to that report was not to discipline the officers, or improve supervision or training, but rather to dismiss the report and ignore its findings.

107.    A 1970 article in the Boston Globe entitled *Hemenway probe remains secret* reported that the BPD Commissioner was refusing to provide details of an incident in which BPD officers broke up a block party and at least 23 citizens alleged they were clubbed or beaten. Even though the Commissioner admitted that officers had used "unnecessary force," he claimed that no criminal charges could be brought, simply because those officers would exercise their Fifth Amendment right not to incriminate themselves. The Commissioner refused to release the officers' names, explicitly because doing so would lead to lawsuits against them.

108.    A 1973 article in the Boston Globe entitled *'Coverup' probed: Byrne gets report on boy's shooting* reported on an incident in which BPD officers shot and killed an innocent bystander, a fifteen-year-old boy, and then attempted to avoid responsibility by fabricating evidence that the boy was shot due to his involvement in criminal activity.

109.    Another 1973 article in the Boston Globe, entitled *FBI joins investigation into patrolman's shooting of Roxbury youth, 15*, detailed the investigation into a possible coverup of another shooting of a fifteen-year-old. While the shooting officer originally said that the teenager

jumped out of a car and attacked the officer with a knife, witnesses said the teen never left the car and was shot while still inside (which was consistent with the downward trajectory of the teen's chest wound). As reported in the Boston Globe, investigation into who was telling the truth was hampered because *the backseat of the car had been removed*.

110.    In January 1974, Defendant O'Malley and another officer, Arthur Linksy, were in plainclothes when they got into a fight with a police informant. A uniformed patrolman, Joseph Fiandaca, intervened and—not realizing they were police officers—punched O'Malley and Linksy, causing Linsky to hit his head on the pavement. O'Malley, who was the most senior, directed the other officers to cover the whole incident up, and O'Malley filed a false police report about the whole thing, fabricating a story that he and Linksy were attacked by a group of youths. Despite that complete fabrication, and O'Malley's subsequent lies to internal affairs, the BPD gave him only a slap on the wrist for "failing to file a report," as if this were a mere administrative oversight. When that incident came to light, it received substantial news coverage, including an article in the Boston Globe entitled *2 disciplined for covering up details of detective's beating*.

111.    In 1975, two undercover BPD officers shot and killed James Bowden, an innocent man, and then lied and said Bowden had a gun and the officers killed him in self-defense; they planted a gun at the scene to support their false story. A federal jury found that the officers were lying and the killing was malicious, willful, wanton, or reckless. This police misconduct was the subject of, among other things, a book, a movie, and a New York Times article entitled *Boston Police Troubles Rise in Dispute Over '75 Slaying*. The book, *Deadly Force* by Lawrence O'Donnell, detailed how BPD officers failed to document when witnesses identified suspects

through photographic identification procedures—just as Defendants did in this case with Deborah.

112.    Numerous cases demonstrate that the same types of misconduct Defendants engaged in with respect to Mr. Jones were pervasive within the BPD around the relevant time, including the following:

   a.    In 1969, Paul Robinson was convicted of two counts of first-degree murder and two counts of assault with intent to rob. BPD officers withheld substantial exculpatory evidence, including exculpatory and impeaching witness statements, evidence of alternate perpetrators, police reports that contradicted officer testimony, and promises of leniency made to witnesses. In 2024, fifty-five years later and with the consent of the prosecutors, Robinson was granted a new trial.

   b.    In 1971, BPD officers withheld exculpatory evidence (statements made by the victim's wife) which led to James Haley's wrongful conviction and thirty-four-year wrongful incarceration.

   c.    Also in 1971, BPD officers used improperly suggestive identification procedures, and suppressed exculpatory evidence regarding a third party who bragged about committing the relevant murder, leading to the wrongful prosecution and conviction of Bobby Joe Leaster.

   d.    Also in 1971, Lawyer Johnson was wrongfully prosecuted and arrested for murder, even though an eyewitness told the BPD that she could identify the perpetrator (a man she knew) and that Johnson (whom she also knew) was innocent. The BPD told her to stay out of it, so she did—for ten years, until she could no longer live with the secret. When she came forward for the second time,

a court explicitly found that her evidence had not been known by the prosecutors. Johnson's conviction was overturned, and the charges against him were dismissed.

e. In 1972, Anthony Mazza's wrongful conviction was caused by BPD officers' failure to disclose exculpatory witness statements (for example, a statement suggesting that the witness's brother, not Mazza, was the murderer) as well as their fabrication of witness identifications (for example, threatening to "put the heat" on a witness unless the witness said Mazza committed the crime).

f. In 1972, BPD officers framed Tyrone Clark for rape, kidnapping, and robbery. They did so by using improperly suggestive identification procedures (including repeatedly showing a witness a photo of their suspect, even after the witness had previously viewed the photo and failed to identify it, just as Defendants did with Condo in Mr. Jones's case), fabricating evidence from a "confidential informant," and suppressing exculpatory evidence (including that the victim told them that Clark "looks so different" from her actual attacker). Clark served over forty-seven years in prison before his convictions were overturned and the prosecutor dismissed the charges against him.

g. In 1973 and 1974, BPD officers coerced and pressured a witness into providing a fabricated identification of Ella Mae Ellison as the driver of a car involved in a robbery and murder. After spending years in prison, Ellison was granted a new trial and the charges against her were promptly dismissed.

h. Laurence Adams was prosecuted in 1974. In that prosecution, BPD officers withheld exculpatory evidence, including witness statements that would have

impeached the credibility of the State's witnesses and exculpated Mr. Adams. One central witness described that her testimony was provided to assist her brother in getting released from incarceration (just as Condo's testimony here was procured by promising not to pursue charges against her daughter).

113.    The BPD's widespread unconstitutional practices continued after Mr. Jones was wrongfully prosecuted and convicted, as evidenced by the wrongful convictions of at least: Ulysses Charles, Frederick Clay, James Watson, James Gallarelli, Shawn Drumgold, Robert Foxworth, Keyon Sprinkle, Clarence Williams, Joseph Jabir Pope, and Floyd Hamilton.

114.    Moreover, Defendants O'Malley and McConkey, specifically, have a track record of civil-rights violations, including at least the following:

a.  These detectives investigated Raymond Gaines as the perpetrator of a murder in 1974. One of the Commonwealth's key witnesses admitted that he lied because O'Malley agreed to keep him out of jail if he did so. A Superior Court Judge vacated Gaines's conviction on November 30, 2022. In overturning Gaines's conviction, the judge cited evidence that O'Malley "falsified evidence in other cases," including filing false police reports, pressuring and threatening witnesses to give false information, and including false information in search warrant affidavits. The judge wrote that "O'Malley's misconduct both prior to and years after the trial is highly probative of how he conducted police investigations." The ruling vacating Gaines's conviction was affirmed on appeal.

b.  Detective O'Malley was involved in the wrongful convictions of Joseph Jabir Pope and Floyd Hamilton. In the Pope and Hamilton cases exculpatory information about potential suspects, which was known to BPD officers including

23

O'Malley, was not disclosed until Mr. Pope and Mr. Hamilton had spent decades in prison. Additionally, O'Malley and the other BPD officers did not investigate genuine suspects, including someone who was found in possession of the murder weapon.

c. O'Malley and McConkey were also involved in the investigation that led to the arrest of Lawrence Taylor. In that case, the court found that the questioning of Mr. Taylor violated Mr. Taylor's constitutional rights, warranting the significant remedy of suppression of the evidence.

d. An independent investigation conducted by Massachusetts Attorney General James Shannon concluded that O'Malley, and other BPD officers, pressured witnesses to give false statements in the infamous 1989 case in which a man named Charles Stuart killed his wife, but BPD officers coerced and incentivized witnesses into identifying the innocent Willie Bennett as the perpetrator instead.

**Defendants' unconstitutional misconduct caused Mr. Jones tremendous harm.**

115. Mr. Jones brings this action to address the extraordinary and unconstitutional misconduct of Defendants, which caused Mr. Jones's wrongful arrest, prosecution, conviction, more than fifteen years of wrongful incarceration, and almost thirty-two years of wrongful parole.

116. As a direct and proximate result of Defendants' actions and omissions, Mr. Jones sustained injuries and damages, some of which will continue into the future, including but not limited to loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; loss of income; loss of educational and work opportunities; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal

contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

117.    As a direct and proximate result of Defendants' actions and omissions, Mr. Jones sustained physical injuries and damages, including: physical pain and suffering, personal injuries, and infliction of physical illness and inadequate medical care.

118.    All of the acts and omissions committed by Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith.

## CLAIMS

### Count I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Deliberately Suppressing Material Exculpatory and Impeachment Evidence, Conducting Impermissibly Suggestive Identification Procedures, and Conducting a Reckless Investigation

*Against Defendants McConkey, O'Malley, and Daley*

119.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

120.    The individual Defendants, acting individually and in concert, deprived Mr. Jones of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial.

121.    The individual Defendants deprived Mr. Jones of his right to a fair trial by fabricating inculpatory evidence and coercing false statements from witnesses, including without limitation the false inculpatory evidence given by Rita, Deborah, and Condo.

122.    The individual Defendants deprived Mr. Jones of his right to a fair trial by deliberately withholding exculpatory and impeachment evidence from prosecutors and defense,

including without limitation evidence of the true circumstances of the witness identification procedures with the three eyewitnesses, evidence that Deborah identified a different person as one of the perpetrators, and evidence that the individual Defendants falsely told Deborah that she had identified the same person as her mother.

123.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Jones's clearly established constitutional rights.

124.    No reasonable officer in 1975 would have believed this conduct was lawful.

125.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

*Against Defendants McConkey, O'Malley, and Daley*

126.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

127.    The individual Defendants, with malice and knowing that probable cause did not exist to arrest Mr. Jones and prosecute him for the Golden Café robbery and murder, acting individually and in concert, caused Mr. Jones to be arrested, charged, and prosecuted for that crime, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures.

26

128.    Specifically, the individual Defendants, acting individually and in concert, initiated a prosecution based on fabricated evidence, and intentionally withheld exculpatory and impeachment evidence that proved a lack of probable cause.

129.    The individual Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Mr. Jones.

130.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Jones's clearly established constitutional rights.

131.    No reasonable officer in 1975 would have believed this conduct was lawful.

132.    The prosecution terminated in Mr. Jones's favor on December 12, 2022, when the prosecution entered a *nolle prosequi*, causing all charges to be dismissed.

133.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III: 42 U.S.C. § 1983 Municipal Liability Claim

### *Against Defendant City of Boston*

134.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

135.    Defendant City of Boston, with deliberate indifference, adopted and/or acquiesced in policies, patterns, practices, and customs that were a moving force in the violation of Mr. Jones's constitutional rights, and, further, defendant City of Boston, with deliberate indifference, failed to properly train, supervise and/or discipline officers and, as such, was a moving force in the violations of Mr. Jones's constitutional rights.

136.    At all times relevant to this case, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals being investigated for potential criminal activity, such as Mr. Jones, were routinely deprived of exculpatory and impeachment evidence, were subjected to criminal proceedings based on false and fabricated evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

137.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material exculpatory and impeachment evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

138.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

139.    The misconduct described in this Count was undertaken pursuant to the policy and practices of Defendant City of Boston in that the constitutional violations committed against Mr. Jones were committed with the knowledge or approval of persons with final policymaking authority for the City of Boston and the Boston Police Department.

140.    The policies, patterns, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Mr. Jones to suffer the grievous and permanent injuries and damages set forth above.

### COUNT IV: Malicious Prosecution under Massachusetts Law

*Against Defendants McConkey, O'Malley, and Daley*

141.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

142.    The individual Defendants initiated or continued proceedings against Mr. Jones, without probable cause, with malice or specific intent to injure.

143.    The judicial proceedings against Mr. Jones were terminated in his favor, in a manner indicative of his innocence, when his convictions were vacated and the Commonwealth of Massachusetts entered a *nolle prosequi*, causing all charges to be dismissed.

144.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT V: Negligence

*Against Defendants McConkey, O'Malley, and Daley*

145.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

146.    The individual Defendants owed Mr. Jones a duty of exercising reasonable care during their investigation.

147.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

29

148.    The individual Defendants owed Mr. Jones a duty to refrain from framing him for a crime he had not committed.

149.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

150.    The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Mr. Jones's clear innocence.

151.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI: Intentional Infliction of Emotional Distress

*Against Defendants McConkey, O'Malley, and Daley*

152.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

153.    The actions and omissions of the individual Defendants set forth above were extreme and outrageous. These actions and omissions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that they would cause, severe emotional distress to Mr. Jones, as is more fully alleged above.

154.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones suffered severe emotional distress.

155.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent

approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above, which include physical harm.

## COUNT VII: Negligent Infliction of Emotional Distress

*Against Defendants McConkey, O'Malley, and Daley*

156.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

157.    The individual Defendants owed Mr. Jones a duty of exercising reasonable care during their investigation.

158.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

159.    The individual Defendants owed Mr. Jones a duty to refrain from framing him for a crime he had not committed.

160.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

161.    The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that the individual Defendants' actions and omissions would cause any reasonable person, including Mr. Jones, emotional distress.

162.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones suffered emotional distress.

163.    As a direct and proximate result of the individual Defendants' actions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above, which include physical harm.

## COUNT VIII: Violation of Mass. Gen. Laws, ch. 12, § 11H

### *Against Defendants McConkey, O'Malley, and Daley*

164.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

165.    Through their conduct described above, including threats, intimidation, or coercion, which conduct was objectively unreasonable and/or knowingly unlawful, the individual Defendants interfered with Mr. Jones's exercise and enjoyment of rights guaranteed to him by the United States Constitution and the constitution and laws of the Commonwealth of Massachusetts, and by federal and state laws.

166.    As a direct and proximate result of the individual Defendants' actions and omissions, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IX: Negligent Hiring, Training, and Supervision

### *Against Defendant City of Boston*

167.    Mr. Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

168.    While committing the misconduct alleged in the preceding paragraphs, the individual Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

169.    The City had a duty to exercise reasonable care in the hiring, retention, training, supervision, and discipline of its employees, all of whom regularly interacted with members of the public.

170.    The City breached that duty because it was aware or should have become aware of widespread and recurring problems with detectives and officers of the BPD—problems which foreseeably led to citizens being denied their constitutional rights and being wrongfully prosecuted and convicted—but the City failed to take any action to ameliorate those problems, such as investigating, disciplining, discharging, or reassigning the detectives and officers.

171.    As a direct and proximate result of the City's negligent hiring, training, supervision, and discipline, Mr. Jones was wrongly prosecuted, convicted, and imprisoned for more than fifteen years, spent approximately thirty-two years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT X: *Respondeat Superior*

*Against Defendant City of Boston*

172.    Mr. Jones hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

173.    While committing the misconduct alleged in the preceding paragraphs, the individual Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

174.    Defendant City of Boston is liable as principal for all torts committed by its agents.

### **PRAYER FOR RELIEF**

175.    WHEREFORE, Mr. Jones demands judgment jointly and severally against Defendants as follows:

      a.    That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

b. For pre-judgment and post-judgment interest and recovery of his costs, including

reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 as well as any other

applicable laws; and

c. For any and all other relief to which he may be entitled.

Dated this 21st day of October, 2025.

Respectfully submitted,

By:    /s/ Anna Benvenutti Hoffmann
       Anna Benvenutti Hoffmann (BBO #660595)
       Nick Brustin*
       Mary Katherine McCarthy*
       Katherine Cion*
       NEUFELD SCHECK BRUSTIN
       HOFFMANN & FREUDENBERGER, LLP
       200 Varick Street, Suite 800
       New York, NY 10014
       anna@nsbhf.com
       nick@nsbhf.com
       katie@nsbhf.com
       kcion@nsbhf.com
       Phone: (212) 965-9081

By:    /s/ John J. Barter
       John J. Barter (BBO #032150)
       83 Atlantic Avenue, Suite 300
       Boston, MA 02110
       barterj@msn.com
       Phone: (617) 367-2545

By:    /s/ Amy M. Belger
       Amy M. Belger (BBO #629694)
       2125 Washington Street
       Holliston, MA 01746
       appellatedefender@gmail.com
       Phone: (917) 558-3120

       * *Pro hac vice* applications forthcoming

       *Attorneys for Plaintiff Milton Jones*

34